UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUELIN FITZPATRICK,

    Plaintiff,

    v.

RAYMOND MANAGEMENT
COMPANY, et al.,

    Defendants.

No. 10 C 252
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff filed her three-count complaint alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act (ADEA). Plaintiff alleges that Defendants discriminated against her due to her race and age. Defendants now move for summary judgment on all counts. Because Plaintiff has not suffered an adverse employment action, Defendants' motion for summary judgment is granted.

### I.    BACKGROUND

Plaintiff Jacquelin Fitzpatrick is a 60-year-old African-American woman. From 2001 until May 21, 2008, she worked as Sales Manager at the Hampton Inn in Skokie, Illinois ("the Hampton"). Her responsibilities in this position were twofold: "inside sales", where she managed calls coming into the hotel by parties seeking to book an event; and "outside sales", where she solicited potential new customers. Toward the end of 2007, Hampton experienced a significant decline in inside sales due in part to the increased competitiveness of another local hotel, The Doubletree. The management at Hampton quickly realized that they needed to expand their sales efforts in order to remain competitive. Sometime in late 2007 or early 2008, Janice

Alvarez, Director of Sales and Plaintiff's immediate supervisor, and Roy Myles, the General Manager, told Plaintiff that they planned to hire an additional Sales Manager to focus on outside sales.

Around this same time Plaintiff's relationship with Alvarez and Myles began to sour. Among other things, Plaintiff claims that Myles and Alvarez barely spoke to her and were dismissive of her requests for help with her outside sales efforts. Plaintiff also claims Myles and Alvarez began cutting her out of meetings and other events in which Plaintiff previously participated, such as planning for the office holiday party and attending the annual sales conference. At one point during this late 2007/early 2008 time period, Plaintiff overheard Alvarez or Myles remark "we need to do the same thing at our hotel to compete." Plaintiff interpreted this as a reference to the Doubletree, which had recently hired a "young blond woman" as its sales manager. Plaintiff suspected that Alvarez and Myles' icy behavior toward her was part of an effort to push her out so that the Hampton could hire a young blond woman of their own.

Plaintiff's suspicions were confirmed, at least in part, on Sunday, March 9, 2008, when Myles called her at her home and stated that he and Alverez "would like to hire someone young and cute to be the Sales Manager and we would like for you to step down and become the Sales Coordinator"–a clear demotion. Plaintiff demurred and stated that she wanted to talk with Myles and Alvarez about it the next day. The next day Plaintiff voiced her objection to the demotion with Alvarez, but the parties dispute what Alvarez said in response. Plaintiff claims that Alvarez stated "this is what we're going to do and you either have to accept it or you don't." Defendants claim that Alvarez told Plaintiff that she had "misunderstood Myles and explained that they did

not want to change Plaintiff's position, but instead wanted Plaintiff to focus on sales." What is not disputed is that Plaintiff was never actually demoted and Myles and Alvarez made no further requests for her to step down as sales manager.

Over the weeks following the March 9 phone call, things got worse for Plaintiff. The Hampton hired an additional sales manager who was much younger than Plaintiff. Plaintiff was not included in the interview process and felt that this was a sign she was going to be replaced by the new hire. Although Plaintiff continued to meet with Myles and Alvarez twice a week to discuss sales efforts, she claims that these interactions were strained and uncomfortable. Other staff members noticed that Plaintiff's relationship with Myles and Alvarez had significantly deteriorated. Around May 1, 2008, Plaintiff sought out an employment reference anticipating that she may soon need to find new work.

On May 20, 2008, a co-worker called Plaintiff at home and stated, "I heard you are going to be fired because they want this other girl for your position." The co-worker did not tell Plaintiff the source of this information. Although Plaintiff had no personal knowledge that she was going to fired, this phone call was the final straw for her. She decided to resign the next day in order to avoid any stigma of being terminated. On May 21, 2008, Plaintiff tendered her resignation letter to Myles and Alvarez.

On October 9, 2008, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging race discrimination, age discrimination and retaliation. The charge named only Hampton Inn as the defendant. Plaintiff claims that she filed an Amended Charge of Discrimination with the EEOC around February 26, 2009, that named North Shore Lodging Associates and Raymond Management Company as defendants.

3

The EEOC has no record of this. However, any potential problems with Plaintiff's failure to exhaust need not be addressed because she has not suffered a cognizable injury under Title VII or the ADEA.

## II. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts presented are to be construed in a light most favorable to the nonmoving party. *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

## III. DISCUSSION

For Plaintiff to obtain relief under Title VII and the ADEA, she must first show that she suffered an adverse employment action based on her race (Title VII) or age (ADEA). There are three general types of adverse employment actions: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Barton v. Zimmer*, No. 10-C2212, 2011 WL 4921603, at *4 (7th Cir. Oct. 18, 2011).

The fact that Plaintiff was not terminated, suffered no reduction in pay or benefits, or any change in position or responsibility takes this case out of the realm of categories one and two. What remains is category three: constructive discharge and cases of severe harassment or mistreatment.[1] *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744-45 (7th Cir. 2002). The Seventh Circuit has described category three cases generally as those "in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment- an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Id*.

"Constructive discharge" refers specifically to cases in which an employee was "forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *E.E.O.C. v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002). Constructive discharge can come in two different forms, but "neither dispenses with the requirement that the work environment had become intolerable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The first involves resignations due to discriminatory harassment. The second involves resignations prompted by employer behavior that communicates to a reasonable employee that she will soon be terminated. *Fisher v. Avanade*, 519 F.3d 393, 409 (7th Cir. 2008).

---

[1] Plaintiff appears to limit her theory of the case to a constructive discharge claim; I limit my analysis accordingly.

A plaintiff who alleges constructive discharge by way of discriminatory harassment must demonstrate a discriminatory work environment "even more egregious than the high standard for hostile work environment." *Univ. of Chicago Hosps.*, 276 F.3d at 332. This is because employees are generally expected to remain employed while seeking redress from harassment so that the employer may have an opportunity to remedy the problem. *Chapin*, 621 F.3d at 679. The rare cases in which harassment is so extreme that the employee is excused from remaining on the job usually involve threats of physical violence. *See, e.g., Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (constructive discharge where discriminatory harassment involved repeated use of noose and implied threats of physical violence); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge where supervisor held firearm to plaintiff's head). The facts alleged in this case do not come close to painting a picture of an egregiously hostile work environment, so Plaintiff can have no success under this form of constructive discharge. *Chapin*, 621 F.3d at 679.

The second form of constructive discharge–employer behavior suggesting imminent termination–requires a showing that, along with a hostile work environment, the employer's actions communicated to the plaintiff that "the handwriting [was] on the wall and the axe was about to fall." *Fischer*, 519 F.3d at 409. Similar to the first form of constructive discharge, there is a general requirement here that the employee remain on the job until the signs of impending termination are so apparent that it would be unreasonable to force the employee to wait around and be fired before extending legal protection. *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998). In some situations, "the standard of reasonableness will require the employee who wants to make a successful claim of constructive discharge to do something

6

before walking off the job," such as confronting supervisors for an explanation of poor treatment. *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998).

These requirements do not exist to impose additional hardships on the employee. They exist because courts are poorly situated to speculate over what would have happened had the employee stayed on board a little longer. *See Cigan v. Chippewa Falls School Dist.*, 388 F.3d 331, 333-34 (7th Cir. 2004) ("[t]he only way to know how matters will turn out is to let the process run its course. Litigation to determine what *would* have happened...is a poor substitute for the actual results of real deliberation within the employer's hierarchy."). Without such requirements employees could jump ship at the first sign of trouble on the job, and the federal anti-discrimination statutes would be warped into tools for combating everyday office pettiness rather than invidious discrimination. ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace.") (emphasis in the original). *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000).

Locating the dividing line between what a reasonable employee can and cannot be expected to endure before resigning is not an exact science, but the higher courts have provided helpful guidance. For example, in *University of Chicago Hospitals* the Seventh Circuit found constructive discharge where the plaintiff returned from vacation to find her belongings packed and her office being used as storage space. 276 F.3d at 330. This, after Plaintiff had been told that her immediate supervisor had been fired for refusing to fire the plaintiff, and the immediate supervisor's replacement told the plaintiff that her inability to locate certain records was "the last straw." *Id*.

In *Hunt v. City of Markham, Ill.*, the Seventh Circuit held that there was a genuine issue of material fact over whether the plaintiff–a white police officer who resigned after having been denied several raises and a promotion, made subject to multiple racist and ageist comments, and told by the city chief of police that he was not wanted at the department and had no future–was constructively discharged. 219 F.3d 649 (7th Cir. 2000). The court stated that even seemingly "stray remarks" of a derogatory character can be evidence of actionable discrimination if made by the decision makers, or those who influence them, around the time of, and in reference to, the adverse employment action complained of. *Id*. at 652. However, the court stressed that discriminatory intent has to be coupled with *action* that substantially affects the terms and conditions of employment in order to trigger the protections of federal anti-discrimination law. *Id.* at 653. Because the plaintiff in the case was subject to prejudiced comments *and* allegedly denied raises and a promotion based on his age and race, there was a triable issue of fact.

Conversely, in *Fischer*, the Seventh Circuit found no constructive discharge where a female plaintiff, after complaining about "morale building dinners" at a gentleman's club and eventually filing a sex discrimination complaint with the EEOC, was told she had to relocate out of state to keep her current position or else transfer to another region, had her cellular and broadband expenses audited, and received a negative performance review after her supervisor had expressed dismay over the EEOC charge. 519 F.3d at 410. The court noted that while these were "not circumstances an employee would wish upon herself", working conditions had not become "unbearable" such that Title VII protections were triggered. *Id*.

Based on the facts before me and the legal framework laid out above, there is no genuine issue of material fact over whether Plaintiff's work conditions amounted to constructive

8

discharge. The Defendants' actions that Plaintiff complains of–cutting her out of meetings, trips, and event planning, hiring a "young and cute" sales manager, and general curtness–simply do not rise to the level of an adverse employment action, and cannot be reasonably characterized as creating unbearable working conditions. The aggregate picture of Plaintiff's day-to-day life at the Skokie Hampton is no worse than the working conditions in *Fischer*. Although rumors may have been flying about Plaintiff's future at the Hampton, the fact is that Defendants did not themselves give sufficient signals that Plaintiff would be terminated for her to claim protection under the constructive discharge rule.

I want to be clear: just because Plaintiff does not satisfy a necessary legal standard does not mean I doubt her working conditions were undesirable. I am particularly troubled by the March 9, 2009 phone call in which Defendant Myles asked Plaintiff to step down so that she could be replaced with someone "young and cute." Far from "innocuous," this comment was unprofessional, offensive, and–"stray remark" or not–it is evidence of discriminatory intent. *Hunt*, 219 F.3d at 652. The problem for Plaintiff is that this discriminatory intent was not coupled with sufficient action to constitute a cognizable injury under the federal anti-discrimination statutes. *See generally Id.* at 652-53.

I also do not find Plaintiff's theory that Defendants had a long-term plan of pushing her out the door for someone younger to be the least bit implausible. But, in executing that plan, Defendants would have to go beyond hiring a new employee who fit the "young and cute" bill and cutting Plaintiff out of meetings, event planning, etc., for federal law to offer her protection. *See Hunt*, 219 F.3d at 653. The proximate cause of Plaintiff's resignation was a rumor she heard from a co-worker that she was going to be fired. This is one of those cases in which the standard

9

of reasonableness required Plaintiff to do something–i.e. take action to determine the veracity of the rumor–before walking off the job. *Lindale*, 145 F.3d at 955. Allowing Plaintiff's case to go forward based on these facts would require me to draw inferences akin to the type of "poor substitute" speculation that the higher courts have cautioned against in employment discrimination cases. *Cigan*, 388 F.3d at 333-34; *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("we are not required to draw every conceivable inference from the record."). Although I am sympathetic to Plaintiff's situation, I decline to do so.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: November 8, 2011